THE CENTRAL MILITARY TRACT RAILROAD COMPANY, Appellant, *v.* A. ROCKAFELLOW, Appellee.

#### APPEAL FROM BUREAU.

The law makes a distinction in the liability of railroad carriers, between injuries to persons and property transported, and injuries to persons and property coming upon a railroad track, without the intervention of the company.

Railroads are not common highways in the sense of public wagon roads.

In passing public highways and streams, where others have common rights, railway companies must exercise the same care, and their liability will correspond with that of all others passing and doing business on them.

In an action against a railway company for killing an animal, it is erroneous to charge the jury, that if the animal was running at large, and went upon the road where the same was unfenced, that it was lawfully there, and if killed by any want of ordinary care and diligence, then the railroad company is liable for the destruction; or that if said animal was killed, because the engineer in charge of the train was not keeping a proper look out in advance of the engine, without regard to his other duties, then it was such negligence as would make the company liable.

A railroad company has a right to run its cars upon its track, without obstruction, and an animal has no right upon the track without consent of the company; and if suffered to stay there, it is at the risk of the owner of the animal.

An allegation of negligence in the management of the train, is not supported by proof that too heavy a train was fastened to the locomotive.

A person who has no religious belief, who does not acknowledge a Supreme Being, and who does not feel himself accountable to any moral punishment here or hereafter, but who acknowledges his amenability to the criminal law, if he forswears himself, cannot become a witness.

The unbelief of such a person is best established by the testimony of others; though he may be permitted to explain any change of belief, and leave the court to determine as to his ~~competency~~. *credibility & even fluency.*

THIS was an action on the case. The declaration alleges that plaintiff was possessed of an ox of the value of $100, which ox was then and there lawfully running at large, and the defendant was then and there possessed of a certain railroad, which was uninclosed, and of a steam engine and train of cars then running on said road, and the defendant so carelessly, negligently, unskillfully and improperly drove, governed and directed said engine and cars that, by the carelessness, negligence, unskillfulness and improper conduct of the defendant, by its servants, the said engine was driven upon the ox of the plaintiff, and injured him so that he was rendered perfectly worthless.

Plea, general issue, and a special plea that the said ox at the time when, &c., was, by and through the fault, negligence and carelessness of the plaintiff, running at large in the vicinity of and upon the defendant's railroad, the plaintiff then and there knowing and suffering the said ox to run at large and upon the said railroad, and in consequence of said carelessness, fault and negligence of the plaintiff, the said ox was injured.

The case was tried by a jury and a verdict for the plaintiff for $50, and judgment thereon.

The bill of exceptions shows that on the trial the plaintiff showed, by deposition of William Fox, as follows: I know he had an ox killed about the middle of April, A. D. 1855.   I suppose it was between six and seven in the evening.   The ox was killed by a freight train about a quarter of a mile from the depot at Arlington; when I first saw the train, it was about three or four hundred yards from where it first caught the ox; when it caught the ox on the cow catcher, it shoved it along some seventy-five yards; when plaintiff and I first came up to the bank, the engineer, was just in the act of knocking the ox in the head; the engineer looked up and said, is this your ox?' plaintiff said, yes sir; then the engineer said, "you ought to have another one and go to hell;" then words passed between them which I do not recollect; they were pretty sharp words; by this time the conductor came up and told plaintiff he should be paid for the ox; by that time they had the ox knocked in the head; they rolled him off the bank and went ahead.   The ox was not on the railroad track when I first saw the train coming; I did not see the ox on the track until the time it struck him; do not know whether the ox was on the track or not when I first saw the cars, I was about a quarter of a mile off; do not think I could have seen the ox if he had been on the track when I first saw the cars.   Where the cattle cross the track, it was right at the mouth of a cut; and in lower ground than where I stood; so I think that on the cars they had a better opportunity than I had.   The ox run along the railroad before the cars struck him seventy-two steps; I knew by the tracks; the railroad track was muddy; mud was six to ten inches deep; I was not acquainted with the engineer or conductor on that train; I had seen them before; the conductor usually run the freight train; the engineer the freight and passenger both; I heard the train whistle when it was about two hundred steps from where it struck the ox; the ox was worth $55 or $60 when killed. The ox was about nine years old; at the time plaintiff and the engineer were jawing, if my memory serves me right, the engineer stood in motion to throw his axe; plaintiff said, "if I had my gun I'd shoot you;" did'nt see the ox at all from the time I first saw the train until the train stopped; plaintiff suffered the ox to run at large on the prairie in the vicinity of the railroad; it did not go on the railroad only as it crossed, as I know of; the railroad was not fenced—nothing to hinder him from going on it where he pleased.

Plaintiff then called John Briney as a witness, who testified

as follows: Somewhere about the middle of April, 1855, I was going to the stable; saw the locomotive coming; saw it stop still; I did not hear a whistle; went down there and found that they had run over plaintiff's ox; the ox had one horn off and was otherwise so badly bruised, he could not rise; the ox had gone along the track from the point where he came on the road ahead of the cars about seventy yards; he came on the track at a place where cattle and men were in the habit of crossing the railroad track; it was on plaintiff's land; it was between two cuts, through which railroad run; the train was running eastward; when I first saw the cars they were about one hundred yards from the place where the ox was killed. It was late in the afternoon, but I should think before sun down; it was rainy and foggy; I was about one-fourth of a mile off; I could have seen a man standing on the top of the cars when I first saw them; place where ox was killed was about half a mile from Arlington, east; the road was on a straight course from Arlington; I saw the tracks of the ox where he had passed along on the centre of the railroad track; I tracked him back from the place, where he was killed, to where he came on; it was muddy; I knew the ox; drove him a good deal; he was worth about $60; we had worked him during the winter and the day before he was killed; the cattle had been running on the prairie and were going home when this ox was killed; the place where the ox came on the road was where men and stock usually crossed; I think it is down grade, from east to west, where ox was killed.

Cross-examined. The cattle were crossing; they all had crossed but this ox; he went up the track; the cattle were running at large; might have run on the railroad track if they liked; think the wind came from the east; people traveled on a track that run north from the place where the ox came on the railroad track; crossed the railroad track at that place; I don't know any thing about a laid out road; I did not mean that the railroad track where the ox was, was Rockafellow's land; it was his before the railroad was built; where the ox was killed the railroad occupied it one hundred feet wide.

Direct resumed. Plaintiff lived about fifty rods north from where the ox was killed; the track that was traveled was fenced on one side of Waigh's fence.

Plaintiff then called Benjamin Parks, who testified as follows:

I have never traveled across the railroad at the place where the ox was killed; there is a track that is traveled somewhere there; I have never been enough along there to tell much about the travel; I saw a place somewhere there where there were tracks across the railroad of men and horses—I think wagons, but am not positive; my son-in-law has been in the habit of

crossing repeatedly with his wagon and his sled somewhere there, and must have crossed there.

Here the plaintiff rested his case.

The defendant, to maintain the issue on its part, called Ira Aldrich. The plaintiff objected to his being sworn on account of his want of religious belief; said witness was then sworn on his *voir dire*, and examined by the plaintiff, and testified as follows:

I don't believe in the existence of a God, particularly; can't say whether I believe it or not; I have no belief either one way or the other; there may be a God and there may not; never made up my mind on that subject; I don't believe there is a God who punishes for perjury, either in this world or any other; I don't believe any thing about it; it may be and it may not; I have no opinion about it.

Examined by defendant. I am certain that there is an obligation on my part to tell the truth when sworn; I am not certain that there is a Supreme Being who rewards and punishes men; I am not satisfied that it is so, and I am not certain that it is not so; I have no belief one way or the other.

Examined by the court. I believe I should be responsible to the civil law if I should testify falsely; and, further, that I should be punished by losing the esteem of my fellow men; I don't know that I am bound in conscience, for I can't say what conscience is, unless it is judgment; I don't believe that there is a Supreme Being who will reward and punish men; I do not believe that it is so, and do not say that I disbelieve it; I have no belief about it.

Examined by defendant. I only say I am not certain one way or the other; I have no certainty that I may not be punished for perjury, and no certainty that I may be; I feel obligated to tell the truth aside from the actions of the civil law, and aside from what others may think of me.

The court thereupon refused to permit said witness to be sworn or to testify.

The defendant then called James Waugh, who testified as follows:

I have seen the ox that was killed; have seen him work; the ox looked pretty hard; he was a raw boned ox and might be fatter than he looked to be; I think that ox worth $30 at least; Rockafellow's cattle run at large; we had a fence on one side of the railroad at my father's farm; there is no fence north of the railroad; plaintiff's cattle could run on the railroad; I don't know of any road crossing the railroad where the ox came on to the track; the railroad put in a crossing for plaintiff about eighty rods east of where the ox came on the road; don't think there

was then any traveled track crossing the railroad where the ox came on the track.

Cross-examined.  There was a traveled track crossing the line of the railroad there, running from the plank road north, across the railroad, and past defendant's house, before the railroad was built.  There was no crossing put in across the railroad there after the road was built; there was a place where they could cross eighty rods further up east, when it was not very muddy; they there crossed under an aqueduct; a bridge was made by public officers not far from this cut; it was made before the railroad was built; the track leads north from the plank road; there used to be a great deal of travel on that line before the railroad was built.  I saw the ox after he was killed; have seen all of plaintiff's cattle; when I saw the ox dead I knew which one it was; if the ox had been in right good order for beef, I think he would have weighed over one thousand pounds.  There were two bridges built by the public officers on what I understand to be the laid out township road, between the railroad somewhere near where the old traveled track spoken of used to run; they were nearly on the same ground; the new road was short, and the traveled track differed from it by making a few meanders on account of the ground; they frequently run into each other; my father has a fence on the north side of the railroad, and also one which runs north and south, which comes south to railroad; the cut where the ox came on to the road.

The laid out road, which crossed the line of the railroad, and the old traveled track, both crossed the line of the railroad on that cut; the railroad company made a crossing for plaintiff, but they did not make it till after the ox was killed.

Direct resumed.  Can't say that the track which was traveled before railroad was built, crossed the line of the railroad at the precise point where the ox came on the track; the bridges I understood to be on the laid out township road; this township road, as I understand it, varies from the old traveled track, though sometimes one runs into the other, sometimes not; I don't recollect about the old traveled track at the point where it crossed the railroad; the old traveled track used to run through where our field is before it was broken up; after our field was fenced, it crossed the line of the railroad not far from the line of our field.

Nelson Knapp was then called by defendant, and testified as follows: I was on the locomotive when the plaintiff's ox was killed; it was about the middle of April last, about 5 o'clock P. M., about half a mile east of Arlington; it was raining hard; it was not dark; should think it was about sundown; it was a

freight train going east; we had stopped at Arlington to wood and water; I don't recollect whether the window was open or shut; we sometimes close it when it rains hard. I saw some cattle cross the track. They all crossed the track except this one; he went down the track into a cut; then we hit him. The engine was reversed, and every thing done to save the ox. The train might have been forty rods off from the ox when he first came upon the track. The other cattle went across, and I thought he was going across, but he turned down on the track. He came up the bank, and appeared to be going across; he had got through the first cut when I discovered him; we were going not faster than five or six miles an hour. I think it is down grade going east, but I don't know, it seemed so to me. I did all I could to save the ox, reversed the engine and put on steam. It was a heavy train and the track was wet; I could not stop it. The engine was reversed and the train could not be stopped; I can't recollect whether the brakes were whistled down or not, think they were; it was customary always to do so in such cases; nothing could be done to stop the train. The ox was struck some six or eight rods from where it was when I first saw it; the train had nearly stopped; I think if there had been two or three rods more we could have saved it; don't think we were going more than half a mile an hour when we hit him, he was then on the track between the rails; the ox was walking all the way, did not run a step; I thought it was a poor ox; I thought if it had any life at all it could have got out of the way of that train; the ox was very poor, he staggered, seemed to be very weak before he was hit. If the whistle did blow, it was for the purpose of closing down the brakes.

Cross-examined. Was on board the locomotive; was engineer; was in the employ of the Central Military Tract Railroad Company; can't tell whether the track was filled up even with the ties at that time. The ox got under the cow catcher; this was because the pilot was too short. If there had been a long pilot it would have thrown him off any how; when I first saw the cattle, I had just got through the cut; sometimes we whistled to scare cattle off the track, but first we whistled the brakes down; I can't tell whether we whistled to scare the cattle or not, or whether I sounded the whistle or not. I did not see the cattle sooner on account of running in the cut. I tried to stop the train at once; I don't know whether the brakes were wound down or not. I can't tell how long it would take to stop the train on such a wet and clayey track; the wheels of the locomotive did not hold any. I don't remember whether I looked down the track ahead of the engine coming through the cut; I don't remember that I swore before the justice that I was but

five or eight rods off when I first saw the ox; don't recollect of saying before the justice that it was cold and raining, and I did not look ahead of the train down the track; I tried to tell the truth before the justice; I do not say I did not swear before the justice.

There was a full complement of men on the train, but I don't know whether they did their duty or not. It was my business to keep look out ahead; before I got near the cattle they were all off the track but this one; they were crossing the track when I saw them; some had crossed, some were crossing, and some were not yet on the track; can't say how far off. The engine was one of the heaviest on the road; it was a heavy train; don't recollect how many cars there were; thirty, and perhaps not so many. As soon as I saw the ox turn down the track, I reversed the engine; I can not tell what made the ox turn down the track; I don't think it was because he was afraid of the engine; don't think it would take one-fourth of a mile to stop the train; don't know where the train was made up; don't know whether the cars were loaded, they usually were at that season of the year; don't think it safe to run so large a train that it could not be stopped in one-fourth of a mile; think I could have stopped this train in a quarter of a mile with a dry track and a proper train, and all things in reasonable good order. A train can be stopped in its own length, with a train such as I ought to have to be safe. A dry track and every thing right, I think a train could be stopped in twenty rods, perhaps; don't know exactly how far it was from the place where the ox came on the track to where he was hit. The train was heavier than the engine could manage; it was a very heavy train, too heavy to be safe; the train was on the Central Military Tract Railroad.

Direct resumed. A train cannot be handled any way when the track is in such a state; I don't know that I was in the employ of the Central Military Tract Railroad Company; don't know whether the railroad was owned by that company or the Chicago, Burlington and Quincy Railroad Company. I have seen cars marked in that name on the road, and I have run under the same employment on the Peoria and Oquawka Road. I was employed by a man by the name of Frink; he did not tell me for what company, but I was to run an engine on this road; don't know in whose employ Frink was.

Cross-examination resumed. I understood the Central Military Tract Railroad to run from Mendota to Galesburgh; it was on that road the ox was killed. If any one had asked me then in whose employ I was, I should have answered, in the employ of the Central Military Tract Railroad Company.

The defendant then called Samuel Huffstodt, who testified as

follows : I was fireman on the engine when plaintiff's ox was killed ; it was some time in April last, in the evening about sundown ; can't tell how far we were from the ox when we first saw him ; I think we were coming out of the first cut from Arlington ; when I first looked out I saw the cattle crossing the track ; I think the engine whistled down brakes, but I could not say, I don't remember ; I shut the fire door, that is the rule. The engine was reversed ; we were some little distance off from the ox ; can't tell how far ; we were running very slow at the time, probably four or five miles an hour ; it is hard for me to tell the speed ; it is not my business ; the ox walked right down the track, he did not run ; I looked at him all the time on account of the danger ; we had almost stopped when we hit the ox ; we were not going faster than a man would walk ; the track was wet and very slippery ; the wheels were very slippery ; they would not stick. It was a heavy train ; I think it was a down grade we were running, but I am not certain ; I never noticed particularly.

Cross-examined. Don't know how many brakes there were on the cars ; all the cars had not brakes ; there were two brakes that could be worked in the way car on the inside ; can't tell whether the brakes on the other cars were on the top or on tacks.

This was all of the evidence.

The court, at the request of the plaintiff, instructed the jury as follows :

1. If the jury believe, from the evidence, that the ox of the plaintiff was killed by the engine of the defendant, in consequence of the fault, negligence or carelessness of defendant's servants, in charge of said engine, then the jury will find for the plaintiff the damages which the plaintiff has proven he has sustained thereby.

2. If the jury believe, from the evidence, that the ox in question was killed by reason that the defendant's engineer was not keeping a proper look out on the road ahead of the engine, then that is such negligence as would render the defendant liable in this action.

3. If the jury believe, from the evidence, that the ox in question was running at large, and went upon the defendant's railroad at a point where the same was unfenced, then the ox was lawfully upon the railroad ; and then if the jury believe, from the evidence, that while said ox was so upon the road he was killed by any want of ordinary or reasonable care and diligence in the defendant's servants, then they will find for the plaintiff ; the degree of care to which the defendant is bound is such care as is ordinary or reasonable care in the business of transporting freight by steam on a railroad.

4. Said instructions were given by the court, and to the giving of each of said instructions the defendant then and there excepted.

The court refused to give the following instructions requested by the defendant:

8. The defendant has a right to use its railroad and run its cars thereon without obstruction; and the plaintiff's ox had no right to be on said railroad without any person to take charge of him, and without the consent of the defendant; and if the plaintiff either voluntarily permitted said ox to be on said railroad track without right, or negligently suffered said ox to stray upon the track, by means of which the ox was injured, the law is for the defendant.

9. The plaintiff, before he can recover in this cause, must prove that the ox was lawfully upon the railroad track, and said plaintiff had not the right by law to allow his ox to run at large upon the said railroad track of the defendant without the knowledge or consent of defendant; and if he did so, it was at his own risk.

Which instructions the court refused to give; to which refusal of the court to give said instructions the defendant then and there excepted.

The jury found a verdict for the plaintiff for the sum of fifty dollars. The defendant moved for a new trial; the court overruled the motion.

Errors assigned:

1. The court erred in overruling the objection of the defendant below to the 8th and 9th interrogatories in the deposition of William Fox severally, and in permitting said interrogatories and the answers to the same severally to be read in evidence.

3. The court erred in giving each of the instructions asked for by plaintiff below.

4. The court erred in refusing to give the 8th and 9th instructions asked for by defendant severally.

5. The court erred in overruling defendant's motion for a new trial.

This cause was tried before HOLLISTER, Judge, and a jury.

GLOVER and COOK, for Appellant.

TAYLOR and STIPP, for Appellee.

SCATES, C. J. No replication to third plea is copied into the record, but it shows that one was filed, an issue joined, and was tried. This is sufficient to preclude advantage being taken of its absence from the record.

The evidence clearly fails to show gross negligence in plaintiff in killing the ox, and the jury were erroneously instructed as to the degree of diligence required, and the degree of negligence for which they would be liable for damage done to property, circumstanced as the ox was in this case.

The degrees of care or diligence are three, and are well defined and illustrated in Story on Bailments, Secs. 15, 16, 186; Jones on Bailments, 8. Negligence is similarly divided, and made or defined to be the counterparts or opposites of each degree. Story on Bailments, Sec. 17; Jones on Bailments, 8, 9; Angell on Carr. Sec. 10.

There is little difficulty in laying down the rule for care and for neglect, while we are content to state in the language long known, familiar to, and used by, the courts and profession. The difficulty is very little greater, in determining what degree of each is applicable to any given state of facts. The great difficulty is the application of the rule to determine whether the particular facts show the want of the ascertained degree of care, or guiltiness of the negligence applicable to the relation of the parties under the circumstances.

This court, in *Chicago and Miss. Railroad Co.* v. *Patchin*, 16 Ill. R. 198, examined this subject with great care, looking into a great number of cases, and upon a great diversity of facts and circumstances, varying the relation of the parties to each other, and to the property injured, and upon a very full consideration of it, in all its bearings perceivable by them, laid down the rule there adopted. Upon full reconsideration, we find nothing to shake or vary that opinion, and no new authority to settle it otherwise.

We have been referred to *Jackson* v. *Rutland and Burlington Railroad Co.*, 25 Vermont R. 162, as questioning the doctrine of *New York and Erie Railroad* v. *Skinner*, 19 Penn. State R. 298, as unsound, as repudiated by the English courts, but we have not adopted the rule laid down in that case in its full extent.

We are very liable to be misled when we look into the law regulating bailments and common carriers of passengers and goods, and such special relations of parties to each other, and to the property under their care, unless we keep constantly in mind that the principles laid down, as applicable to such relationships, do not apply in their full extent for injuries done to persons and property, with whom and which defendants in actions have nothing to do, and no relation, either as bailee, carrier, or freighter.

Counsel, in arguing these questions, seem frequently to forget all distinction between goods on freight, and trespassing stock

on the road-bed—between walking or driving upon it from idle curiosity or business calls, and taking passage on the cars. But the two relations are very different, and, consequently, the duty for the degrees of care, and liability for degrees of negligence, cannot be the same. Every farmer, mechanic, laborer and citizen, in the pursuit of his ordinary occupation or calling, though not as dangerous and unmanageable as railroad trains, is yet equally liable with railroads for damage done to his neighbor's stock or property of this description. The degrees of care and negligence are th same, while pursuing it upon his own premises, and would be the same if transferred to or done upon the common highways. Railroads are not common highways, in the sense of public wagon roads, upon which every one may transact his own business with his own means of conveyance, but only in the sense of being compelled to accept of each and all, and take and carry to the extent of their ability. In passing public highways and public streams, where others have common rights of passing and transacting their business, the care and liability will correspond with that of all others passing and doing business on them.

Now, the three instructions given in this case, at the instance of defendant, would charge the plaintiff for (1st.) " the fault, negligence or carelessness " of plaintiff's servants, in any degree; (2nd.) if " the engineer was not keeping a proper look out on the road, ahead of the engine," whatever other duties about the machinery might demand his attention; and (3rd.) if the road was not fenced, the ox had a right to be on it, and if killed while so upon it, " by any want of ordinary or reasonable care and diligence in the defendant's (plaintiff's) servants, then they will find for plaintiff (defendant). The degree of care to which defendant (plaintiff) is bound, is such care as is ordinary or reasonable care in the business of transporting freight by steam on a railroad." The obvious sense of these instructions is to put all the loitering stock on freight, or freighting, terms of care, diligence and negligence, upon the railroads of the country. Although we might not interpret them as making railroads insurers, as they are for freights, yet we cannot well stop short of all the care and liabilities of a bailee for reward. The relation of the parties to each other, and that of plaintiff to the property, is wholly misconceived. There are no such relations as bailment or carrier creates—and no such liabilities imposed. *Sic utere tuo, ut alienum non lædas,* has more application, and may be violated by a reckless, wanton, or grossly negligent injury, as we have said in 16 Ill. R. 198.

The eighth and ninth instructions of plaintiff lay down the rule, and should have been given.

The allegations and proofs should agree. The allegation of negligence in the conduct and management of a train is not supported by proof of making up a train too heavy to be managed and controlled by the engine attached to it for transportation. *Mayor* v. *Humphreys,* 1 Carr and Payne R. 251; 1 McLean R. 551; *McKinney* v. *Neil;* Angell on Carr., Sec. 592.

We may reasonably doubt the legal right of owners of wandering stock to question the size and heft of trains, and the power or inability of attached engines, as passengers and freighters might do in cases of delay or damage from such cause.

The questions, as to Aldrich's incompetency for want of religious belief in a God, and a liability to divine punishment for perjury, and the propriety of establishing this disbelief by his own sworn statements, may recur again upon another trial, and we therefore dispose of the question here.

The constitution (Art. 13, Sec. 3) has declared complete toleration of all religions, and a freedom of conscience to every man to worship as he may be enlightened and feel inclined, but it has no provision that modifies the rules of the common law in relation to requiring evidence in courts being given upon oath. Nor has it changed the rules for ascertaining those competent to give it.

The criminal code has declared persons injured by crimes and misdemeanors competent on the score of interest, leaving the question of competency on grounds of infamy, infidelity, lunacy, infancy, &c., as at common law, rendering blacks, mulattoes and indians incompetent, both in criminal and civil cases, against whites. Rev. Stat. 1845, p. 154, Secs. 15, 16; p. 237, Sec. 23. No statute regulates the question before us.

In early times Lord Coke laid down the rule as excluding all not christians—a rule as narrow, bigoted and inhuman as the spirit of fanatical intolerance and persecution which disgraced his age and country. Lord Hale doubted and denied it, and the Lord Chancellor, Lords Ch. Justices of the K. B. and C. P. and Ch. Baron expressly overruled it in *Omichund* v. *Barker,* reported Willes R. 538 and 1 Atk. R. 21. Although the two reports differ somewhat as to the extent of the rule, I regard it as correctly laid down by Chief Justice Willes in his own report of the case, to be, that all are competent who believe that there is a God, the Creator and Preserver of all things, and that He will punish them if they swear falsely, in this world or in the next; and a want of such belief will render them incompetent to take an oath, without which no one can testify in a court of justice.

A liability to civil punishment for perjury, and the fear of it, will not substitute that moral, conscientious obligation under

which witnesses are required to state facts as testimony, and which is supposed to be imposed and exist by an oath taken by one entertaining such belief. The rule laid down in Atkins had reference to future punishments in a life to come, and many writers and courts so follow it. His report of the case was made many years before the corrected manuscript note of it by C. J. Willes was published, which allows a belief of God's punishments in this life or a future state of existence to be sufficient. I think this a sufficient guaranty of truth and to be the true rule, founded in good sense, reason and humanity. The majority of American cases follow it, though there are decisions in favor of the former. But apart from this difference, there is great uniformity and unanimity in the adoption and application of the rule, unchanged by any constitution save that of Virginia, which secures religious toleration and declares that men's religion " shall in no wise affect, diminish, or enlarge their *civil capacities*." This in argument by the court was construed to do away all test in Perry's case, (3 Gratt. R. 641,) though the proofs showed the witness competent, without such constitutional shield.

I have examined all the authorities accessible to me and need not review them; a simple reference may suffice, as I feel confident no one can examine the whole without a conviction that the above rule is fully sustained. 1 Phil. Ev. 10, 11; 1 Stark. Ev. 93, 94; Roscoe Cr. Ev. 129 to 132; 1 Greenleaf Ev. Secs. 368 to 370 and notes; *Wakefield* v. *Ross*, 5 Mason C. C. R. 18, note; *Jackson* v. *Gridley*, 18 John. R. 102; *Butts* v. *Swartwood*, 2 Cow. R. 431; *People* v. *Matteson*, id. 431, note (*a*); *Anonymous*, id. 572, note; *Hunscom* v. *Hunscom*, 15 Mass. R. 184; *Smith* v. *Coffin*, 18 Maine R. 157; *Curtis* v. *Strong*, 4 Day R. 55; *Atwood* v. *Welton*, 7 Conn. R. 66; *State* v. *Cooper*, 2 Tenn. R. 96; *Mc Clure* v. *Tennessee*, 1 Yerg. R. 225; *Norton* v. *Ladd*, 4 N. Hamp. R. 444; *Den* v. *Vancleve*, 2 Southard R. 652; *Arnold* v. *Arnold*, 13 Vt. R. 364; *Scott* v. *Hooper*, 14 id. 538; *Quinn* v. *Crowell*, 4 Whart. R. 337; *Cubbison* v. *McCreery*, 2 Watts & Serg. R. 262; *Brock* v. *Milligan*, 10 Ohio R. 123; *Queen's case*, 2 Brod. & Bingh. R. 284, (6 Eng. C. L. R. 147); *Gill* v. *Caldwell*, Breese R. 28 and note; *Noble* v. *The People*, id. 29, 30 and note *c*. These cases only differ as to the belief of the present or future punishment by God for perjury, and they concur in the legality and necessity of administering the oath in the manner and form recognized by the witness as obligatory upon his conscience, according to the forms used in the country and under the religion of his spiritual faith. So a christian should be sworn upon the Bible or Evangelists, (or affirmed, as allowed by statute,) the catholic upon the Cross, the Jew upon the Pentateuch, the Mohammedan upon the Koran,

the Gentoo by touching the foot of the priest interpreter, and he touching the hand of another bramin or priest, *et sic de similibus.*

But one having no religion, believing in no God, and not accountable to any punishment for falsehood here, or hereafter, except his own notions of honor, veracity, and amenability to criminal justice, cannot be sworn, as no legal, moral, conscientious obligation or responsibility, in the view of the law, can be imposed by an oath, and he may not testify without. And this is no infringement of freedom of conscience, or violation of constitutional tolerance. He may take official oaths, and make ex parte affidavits, for no one but a party interested can object to competency, and that only to giving testimony against him; or, it may be, to sit as a juror; *McClure* v. *Tennessee*, 1 Yerg. R. 206, and such acts as affect the rights of others.

It is simply absurd to swear a witness to testify whether he is capable of taking an oath. The current of the above authorities prescribe the proofs by other witnesses, who may testify to what they have heard him say of his belief, and would exclude the proposed witness from contradiction or explanation. Others would allow his unsworn and some a sworn statement, but would not compel him to make a statement; yet they would allow him to explain what others had heard him say, or show a change of sentiments. I think evidence by the mouths of other witnesses, most consonant to reason, and sustained by the current authorities. Though I can see no well grounded objection to hearing the proposed witness in explanation, and on a change of belief, when voluntary on his part, and sworn or unsworn, as he may choose to offer it, leaving its credit to the due consideration of the court. We are of opinion the witness is incompetent.

The judgment will be reversed, and cause remanded for the errors noted.

*Judgment reversed.*

----

Skinner, J. My views in regard to liability of railroad companies for injuries to stock on their roads, have been heretofore expressed. *Great Western Railway Company* v. *Thompson*, *ante*, p. 131. The rule as to the competency of witnesses, as affected by theological opinion, was laid down by this court as early as 1822, to be, "that all persons who believe in the existence of a God, and a future state," are, unless otherwise disqualified, competent. *Noble* v. *The People*, Breese 29. This criterion of competency, so long acquiesced in, I would not, by judicial decision, disturb.